JOEY P. SAN NICOLAS
SAN NICOLAS LAW OFFICE, LLC
P.O. Box 10001 PMB 602
Saipan, MP 96950
Telephone: (670) 234-7659
Facsimile: (670) 234-9218
jpsn@sannicolaslaw.net

KEVIN T. ABIKOFF (*PRO HAC VICE PENDING*)
SAMUEL W. SALYER (*PRO HAC VICE PENDING*)
HUGHES HUBBARD & REED LLP
1775 I St. N.W.
Washington, D.C. 20006
Telephone: (202) 721-4600
Facsimile: (202) 721-4646
kevin.abikoff@hugheshubbard.com
samuel.salyer@hugheshubbard.com

Attorneys for Plaintiffs
BEST SUNSHINE INTERNATIONAL LTD (BVI)
IMPERIAL PACIFIC INTERNATIONAL (CNMI), LLC

CV 22-00007

FILED
Clerk
District Court

MAY 23 2022

for the Northern Mariana Islands
By_____
(Deputy Clerk)

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| BEST SUNSHINE INTERNATIONAL LTD (BVI); IMPERIAL PACIFIC INTERNATIONAL (CNMI), LLC<br><br>Plaintiffs,<br><br>v.<br><br>COMMONWEALTH CASINO COMMISSION, AS AGENCY OF THE COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS<br><br>Defendant. | Case No. CV 22 00007<br><br>**COMPLAINT** |

102941623_2

Plaintiffs Best Sunshine International Ltd. (BVI) ("Best Sunshine") and Imperial Pacific International (CNMI), LLC ("IPI"), for their complaint against Defendant Commonwealth Casino Commission ("CCC"), allege as follows:

## NATURE OF THE ACTION

1. This is an action for preliminary injunctive relief seeking to preserve the status quo pending a determination of the parties' rights and liabilities by an arbitral tribunal, and for an order compelling arbitration.

2. In March 2014, the CNMI announced that it would hold a competitive bidding process for the first ever casino license to be issued by the CNMI. On July 8, 2014, the CNMI enacted Public Law 18-56 to allow for the issuance of an exclusive gaming license for the operation of a Casino in the Commonwealth.

3. The CNMI decided to issue such a license because it "was faced with significant economic challenges including a significant reduction of government revenues, unfunded government retirement obligations, reduction of the economy, and lack of economic opportunity for residents" and it determined that "the issuance of an exclusive casino license on the island of Saipan with specific development requires that are meant to provide immediate economic stimulus and long-term benefits to the community" was necessary to address the economic challenges facing the CNMI. Exh. 1 (CLA). The CNMI's authority to issue the license derived from Public Law 18-56.

4. The CNMI looked abroad to solve its economic woes. It did so by "publicly solicit[ing] proposals from qualified proposers and establish[ing] a selection procedure that properly and carefully evaluate these proposals based on the promised benefits to the community[.]" Exh. 1. Only two proposals were submitted, both by foreign companies.

5. The first proposal was submitted by Best Sunshine International Limited (BVI). As noted above Best Sunshine International Limited (BVI) ("Best Sunshine") is incorporated in the British Virginia Islands. It is wholly owned by Imperial Pacific International Holdings Ltd., a Chinese investment holding company listed on the Hong Kong stock exchange. The second

proposal was submitted by Marianas Stars Entertainment, another Hong Kong based investment group.

6. Of the two proposals, the CNMI chose the proposal submitted by Best Sunshine as the proposal that best responded to the CNMI's needs and "[Best Sunshine] were chosen to be the licensee." Exh. 1. The CNMI was aware that all of the funds for the development project would ultimately come from Imperial Pacific International Holdings Ltd. through Best Sunshine.

7. CNMI recognized that "the granting of a long-term exclusive casino license provide[d] an extremely valuable significant government benefit to [Best Sunshine]. Exh. 1. Although CMNI chose Best Sunshine "to be the licensee," it determined that the license awarded to Best Sunshine should "be held by a Commonwealth entity and [] required Best Sunshine to form a domestic entity, [IPI], which shall be the designated licensee ("Licensee") and who shall assume all promises obligations and agreements previously made [by] Best Sunshine International Limited in this matter."

8. Accordingly, Best Sunshine formed IPI to enter into the CLA with CNMI. IPI, through one of its directors, Ms. Cai Ling Li, executed the CLA on 12 August 2014. The Lottery Commission executed the CLA for the CNMI. The Acting Attorney General of the CNMI, Mr. Gilbert Birnbrich, signed the CLA as well.

9. Paragraph 1 of the CLA expressly provided that "This License Agreement is intended to implement and supplement the terms of the Act." Paragraph 1 defined the "Act" as Public Law 18-56, which is the law that empowered the CNMI to issue a casino license. The CNMI and IPI made the Act a part of the CLA through inclusion of a copy of the Act as Attachment A. Section 7 of the Act empowers the CCC "to promulgate such rules and regulations . . . to ensure the suitability and compliance with the . . . contractual obligations of owners, operators and employees of casinos."

10. In recognition of the fact that it was Best Sunshine and Imperial Pacific International Holdings Ltd. who ultimately stood behind this development project, the CNMI and IPI also included the "Casino License Application of Best Sunshine International Limited" as Attachment E

to the CLA and the "Business Plan of Best Sunshine International Limited" as Attachment F to the CLA.

11. Paragraph 2 of the CLA provided that "[u]pon issuance of the Casino License the authority of the Lottery Commission over this License shall cease and the Office of the Governor shall have authority for enforcement of the terms and conditions of this License Agreement except for enforcement of the terms and conditions of this License Agreement except for the elements specifically identified for control by the Casino Commission, as identified in section 3 below." Exh. 1. Section 3 identifies the "Commonwealth Casino Commission" (or "CCC") as a commission established pursuant to the Act that "shall have authority for the approval of all casino operations and gaming activities conducted under the Casino License…The authority of the Casino Commission includes the ability to suspend or revoke the Casino License, in accordance with the requirements of the Commonwealth Administrative Procedure Act, for violation of the Rules." In essence, the CCC replaced the Lottery Commission as the government entity charged with authority over the License and the CLA.

12. Paragraph 6 of the CLA required IPI to pay an Annual License Fee of $15,000,000. IPI dutifully paid the Annual License Fee each year between 2015 and 2019.

13. On December 4, 2015, the CNMI promulgated Public Law 19-24. Section 1 of that law stated that its purpose was to enable the CCC "to uphold and to fulfill the terms of the Casino License Agreement granted to the exclusive casino licensee." It also imposed an obligation on IPI to pay to the CCC an annual "Casino Regulatory Fee" of $3,000,000 on or before October 1 of each year beginning October 1, 2015. That fee is due to the CCC "regardless of the actual costs incurred by the [CCC]." 4 C.M.C. § 2309(a). IPI dutifully paid the Casino Regulatory Fee each year from 2016 through 2019.

**The Development contemplated by the CLA**

14. The development project contemplated by the CLA represented a significant investment in the CNMI.

102941623_2

15. CNMI made clear in paragraph 7 of the CLA that it expected Best Sunshine (through IPI) to fulfill the obligations set forth in both its April 2014 Casino Application (Attachment E to the CLA) and May 2014 Business Plan (Attachment F to the CLA), which the CLA referred to collectively as the "Licensee Proposal and Assurances."

16. The commitments encompassed in the Licensee Proposal and Assurances were substantial. Elements of the Licensee Proposal and Assurance included but "were not limited to" the following "specific proposed new construction development requirements," which the CLA defined as the "Proposal Requirements":

  a. 2,004 hotel guest rooms;
  b. 17,000 square meters of total gaming floor area
  c. 13,532 square meters of food and beverage outlets (at least 23 outlets)
  d. 15,000 square meters of retail space
  e. 600 seat theatre
  f. 9,094 square meters of meeting space including ballroom
  g. wedding chapel
  h. 200 villas
  i. 1,050 square meters of fitness area
  j. $100 million themed entertainment facility
  k. 1,900 square meters of spa facility

17. Paragraph 7 of the CLA estimated "the total cost of these Proposal Requirements at $3.14 billion dollars (2014 dollars.)" With that amount of capital investment committed to the development project, the CLA more than fulfilled CNMI's stated objective of "provid[ing] immediate economic stimulus and long-term benefits to the community."

**Section 25 of the CLA and Force Majeure**

18. Given the risks attendant to a project of this scale, the CLA included the following Force Majeure provision in paragraph 25:

> Licensee shall not be in default for any failure or delay in the performance due under this License Agreement if such failure or delay is due to causes beyond reasonable control including, but not limited

4
COMPLAINT

to: Act(s) of God, war(s), strike(s) or labor dispute(s), embargo(es), act(s) of terrorism, fire(s), flood(s), or accident(s) without the fault or negligence of the Licensee ("Force Majeure Event"). Invocation of force majeure by the Licensee shall not excuse any payment obligations to the Commonwealth where the grounds and or purpose for such payments have already accrued.

Where such Force Majeure Event results in failure in the performance or delay exceeding six (6) months of the performance due under this License Agreement, the Licensee may terminate this License Agreement forthwith provided that the Licensee shall not be excused from any payment obligations to the Commonwealth where the grounds and/or the purpose for such payments have already accrued.

A change in law which prohibits performance of this agreement or makes such performance illegal shall result in a suspension of the performance of both Parties under this License Agreement until such prohibition no longer exists, provided that the Licensee shall have the option to terminate this License Agreement upon the adoption of the change in law pursuant to this section 25 as if such change in law is a Force Majeure Event.

19. As described in greater detail below, the CCC has initiated five actions against IPI for the non-payment of fees that IPI is required to pay under the CLA and pursuant to which CCC seeks to revoke IPI's license at a hearing scheduled for 24-25 May 2022.

20. IPI's position is that several Force Majeure Events (described below) excuse IPI from performing its obligations during the course of those events. The CCC disagrees with IPI's interpretation of Section 25 of the CLA as excusing IPI from its payment obligations. The Executive Director of the CCC, which is prosecuting the five actions against IPI, has even filed motions seeking to preclude IPI from presenting any evidence related to a force majeure defense in all five actions. The Executive Director is thus attempting to prevent the CCC from considering the Force Majeure provisions of Section 25 of the CLA at the revocation hearing.

21. There are currently at least two disputes between IPI and the CCC. First, IPI and CCC dispute whether Section 25 of the CLA excuses IPI from its obligation to pay the Annual License Fees and Casino Regulatory Fees for 2020 and 2021, and meet certain other financial obligations, as a result of certain force majeure events, including the global COVID-19 pandemic and specific changes in the law that prevented IPI from performing its obligations under the CLA.

102941623_2

22. Second, IPI and CCC dispute whether IPI is entitled to present Section 25 as a defense in the imminent proceedings CCC is holding on 24-25 May 2022 at which the CCC seeks to revoke IPI's license.

**The Mandatory Dispute Resolution Procedures Under Section 30 of the CLA**

23. The Parties to the CLA recognized that, with a project of this scale, magnitude, and complexity, disputes over how to interpret the Parties' respective obligations under the CLA might arise from time to time and that it therefore would be prudent to provide for a mechanism for the resolution of such disputes. Indeed, in paragraph 30 of the CLA, Best Sunshine (through IPI) and the CNMI "acknowledged that due to the nature and complexity of this License Agreement, disputes may arise concerning requirements."

24. The Parties thus further agreed in Section 30 of the CLA to follow a specific mandatory tiered process for the resolution of any such disputes. Specifically, they agreed that "[i]n order to provide a structure for resolution of disputes the parties agree to the following dispute resolution process that must be used prior to initiation of court proceedings[.]" That mandatory process included the following provisions pertaining to arbitration:

> Parties fail to resolve dispute, Parties may submit the dispute to the American Arbitration Association for non-binding arbitration in accordance with applicable rules and limited by terms of this License.
>
> Parties shall equally share all costs associated with Arbitration.
>
> Decisions of the Arbitrator are not binding and within 30 days of issuance of decision of the arbitrator a Party may submit the issue to the Commonwealth Superior Court.
>
> This process shall not be applicable to License suspension and revocation proceedings as shown in section 31 below.

25. Section 30 defined the type of "disputes" that would be subject to arbitration broadly to include "any and all disagreement(s) between the Parties as to terms or requirements of this License Agreement excluding issues relating to gaming operations which are under the authority of the Casino Commission and proceedings regarding revocation or suspension of this license."

26. IPI seeks to arbitrate its disputes with the CCC about the interpretation, applicability, and availability of Section 25 of the CLA as a defense to the CCC's current actions to revoke IPI's license as required by Section 30 of the CCC.

27. IPI still has the potential to fulfill the objective of the CLA to "provide immediate economic stimulus and long-term benefits to the community" through an infusion of $150,000,000 of capital to restart and ultimately complete the project.

28. But the CCC has put the infusion of that addition capital – and thus the completion of the project – in imminent peril by holding a hearing concerning the revocation of the CLA prior to pursuing arbitration of the dispute between the Parties about whether Section 25 of the CLA (Force Majeure) excuses IPI's inability to make payment and comply with orders issued by the CCC and whether IPI is entitled to present force majeure as a defense in the hearing.

**The Force Majeure Events**

29. Since 2014, IPI's activities in CNMI have been beset by a series of unanticipated natural disasters and unexpected changes in the law beyond the Company's control that have severely hampered its ability to develop and operate the casino and associated facilities.

30. These natural disasters and unanticipated events culminated with the Covid-19 pandemic in March 2020, which resulted in a shutdown of essentially all of IPI's operations and shutoff of all revenue for the company.

31. First, in August 2015 super typhoon Soudelor hit the CNMI, causing widespread damage across the islands. The CNMI's Acting Governor declared a state of emergency as the typhoon downed trees and power lines, destroyed people's homes and damaged the CNMI's physical and electrical infrastructure. At the time, this was the largest typhoon to impact the CNMI in the past 30 years. The typhoon caused significant delays in IPI's development projects. The casino construction site was damaged, as were the infrastructure, housing and other facilities on Saipan that IPI relied on for its operations. The damage made it impossible for the Company to continue construction at a full pace following the storm, and IPI faced many unexpected costs and delays.

32. Three years later, super typhoon Yutu hit the CNMI, again causing extensive damage across the islands. Yutu was even worse than Soudelor, and is considered the strongest tropical cyclone to ever strike the CNMI. The storm left both Saipan and Tinian without electricity or running water and damaged or destroyed buildings and most of the CNMI's infrastructure. As with Soudelor, the damage caused delays to IPI's construction and operations and many unexpected costs. Additionally, the damage caused by Yutu led to a significant decrease in tourism to the CNMI, which in turn caused a steep reduction in IPI's revenue.

33. Despite both of these natural disasters, IPI continued its activities and met all of its obligations under the CLA during these periods. But it was placed in a weakened financial position.

34. While IPI was continuing to recover from the effects of the typhoons, development of the casino and hotel was again severely impacted by unanticipated events, this time changes in federal immigration and labor laws.

35. During the development of IPI's project, the company found that because of the complexity and scale of construction works, it was unable to adequately and fully staff the project using local labor alone. As a result, prior to 2019 IPI used the H-2B visa program and CW-1 visa program to bring skilled international construction workers to Saipan to help supplement local labor on the construction project.

36. In April 2020, then-President Trump issued a Presidential Proclamation suspending the H-2B visa program. The program was initially suspended for 60 days, but this was later extended until the end of 2020. In May 2020, the Department of Homeland Security then issued the Implementation of the Northern Mariana Islands U.S. Workforce Act, which prohibited IPI from using the CW-1 classification for workers whose jobs were classified as construction. These changes meant that IPI was no longer able to renew its employees' visas or bring in skilled, short-term construction works to complete development of the casino in 2020.

37. Finally, beginning in late 2019 the COVID-19 pandemic began to severely impact IPI's operations, eventually resulting in IPI losing essentially all revenue for 2020 and placing the

company in a position where it has been unable to continue development of the casino and meet its obligations under the CLA and to its creditors.

38.     The vast majority of IPI's revenue is generated from tourists visiting the CNMI, primarily from China, Korea and Japan. Chinese visitors in particular account for the greatest percentage of revenue.

39.     In January 2020, to try and contain the spread of COVID-19 on CNMI, Governor Ralph Deleon Guerrero Torres issued Executive Order 2020-01, which placed CNMI under a state of emergency to combat the growing pandemic. The emergency measures included banning all visitors from mainland China from entering the CNMI. Over the course of 2020, the CNMI renewed its state of emergency four times and adopted numerous other restrictions on inbound tourism and on activities on the islands. On March 7, 2020, the government imposed a 14-day government quarantine on travelers entering the CNMI and restricted all gatherings of more than 25 people in a single room. On March 30, 2020, the government extended these measures by creating a curfew from 7:00pm to 5:00am. The CNMI's largest airline, Star Marianas Air, suspended all inter-island flights between Rota, Saipan and Tinian islands. As a result of these measures, CNMI had little to no tourists entering the country beginning in January 2020 and the country was considered in "lockdown" beginning in March 2020, essentially cutting off all nonessential economic activity.

40.     Under these conditions, IPI was ultimately forced to close its premises and cease all operations in the casino on March 17, 2020. The COVID-19 pandemic and protective measures resulted in IPI earning almost no revenue for the vast majority of 2020. The loss of almost all revenue in 2020, combined with the impact of the prior unexpected natural disasters and labor law changes, placed the company in dire financial straits. In particular, IPI's revenue decreased from approximately $412 million in 2018, to approximately $68 million in 2019, to approximately $3.1 million in 2020.

41.     Recognizing the severe impact on IPI's business from these force majeure events, on December 15, 2020, IPI and CNMI, represented by the CNMI Governor and CNMI Lottery Commission, entered into Amendment No. 9 to the CLA. The amendment provided IPI additional

time to fulfill its payment obligations under the CLA to make the Community Benefit Contribution recognizing that the COVID-19 pandemic impacted IPI's ability to make payments that are currently in arears by forcing IPI to close its casino on CNMI. The amendment also noted that the Soudelor and Yutu typhoons, and changes in federal immigration laws, also prevented IPI from completing construction of the first hotel and the casino.

**The Current Proceedings Before the CCC**

42. The Executive Director of the CCC initiated five complaints against IPI in 2020, later consolidated into Enforcement Action 2020-001 (encompassing actions 2020-001 and 2020-002) and Enforcement Action 2020-003 (encompassing actions 2020-003, 2020-004 and 2020-005), as follows:

   a. Complaint 2020-001 included claims for violations of the CLA based on IPI's failure to make Community Benefit Contributions;

   b. Compliant 2020-002 included claims for violations of Commonwealth law and the CLA based on IPI's failure to pay the Annual License Fee for 2020;

   c. Complaint 2020-003 included claims for violation of a prior CCC order (2020-003) requiring IPI to maintain at least $4.2 million in cash or cash equivalents in a bank in the CNMI or United States and for IPI's executives to detail the means by which they would comply with that order;

   d. Complaint 2020-004 included claims for violations of a prior CCC order (2020-004) requiring IPI to pay accounts payable over 89 days old and to certify compliance with that order;

   e. Complaint 2020-005 included claims for violation of Commonwealth law and the CLA for IPI's failure to pay the Casino Regulatory Fee of $3,150,000.00 for 2020.

43. On February 25 and March 2, 2021, the CCC held evidentiary hearings to address the charges against IPI.

44. The CCC only heard from one witness, the CCC's Audit Manager, who testified that the auditors who prepared IPI's financial statement had raised concerns regarding its ability to operate as a going concern and that IPI's operations had halted and its financial position had worsened due to the COVID-19 pandemic.

45. On April 22, 2021, the CCC held a hearing on these enforcement actions and issued Order No: 2021-002. The Order suspended IPI's gaming license, ordering IPI to pay a total of $18.65 million that it found was due under the CLA's Annual License Fee and Annual Regulatory Fee, and imposing a total of $6.6 million in penalties against IPI. The Order also required IPI to comply with previous Orders issued by the CCC. Exh. 2 (CCC Order No: 2021-002).

46. On Nov. 5, 2021, IPI appealed the CCC's Order in the Superior Court for the Commonwealth of the Northern Mariana Islands, arguing that the CCC's Order was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law and unwarranted by the facts. IPI's primary argument was the CCC failed to recognize the doctrine of force majeure despite the present of the force majeure provision in the CLA and the clear, severe impact of a force majeure event, the COVID-19 pandemic, on IPI's ability to comply with its obligations.

47. On March 15, 2022, the Superior Court affirmed the CCC's Order, and IPI appealed this decision in the Superior Court of the Commonwealth of the Northern Mariana Islands. The Superior Court affirmed the CCC's Order, applying a very deferential standard of review and found that since IPI only raised a *force majeure* defense in connection with one narrow violation alleged by the CCC, the CCC's order suspending IPI's casino license could be upheld based on other violations (for which IPI did not raise a *force majeure* defense).

48. The Executive Director of the CCC has now filed five further complaints against IPI before the CCC:

   a. Complaint No. 2021-001 related to failure to pay the Annual License Fee of $15,502,570.00 for 2020, and related failure to adhere to CCC Order 2021-002 (ordering payment, among other things).

   b. Complaint No. 2021-002 related to failure to comply with CCC Order 2020-003

11
COMPLAINT

(maintain cash reserves and other obligations), and related failure to adhere to CCC Order 2021-002 (ordering compliance with Order 2020-003, among other things).

c. Complaint No. 2021-003 related to failure to pay the Casino Regulatory Fee of $3,150,000.00 for 2020/2021, and related failure to adhere to CCC Order 2021-002 (ordering payment of the fee, among other things).

d. Complaint No. 2021-004 related to failure to pay the Annual License Fee of $15,502,570.00 for 2021.

e. Complaint No. 2021-005 related to failure to pay the Casino Regulatory Fee of $3,150,000.00 for 2021.

49. For each of these complaints, the Executive Director of the CCC is seeking, among other things, a Declaratory Order from the CCC terminating and revoking the CLA. The CCC has scheduled a hearing on these complaints for May 24-25, 2022.

50. In response to each of these complaints, IPI has raised *force majeure*, based on Section 25 of the CLA, as a defense.

51. On April 22, 2022, the CCC Executive Director filed motions In Limine seeking orders excluding any evidence of a defense of force majeure in connection with the claims against IPI. The CCC Executive Director argues that IPI should not be permitted to even introduce evidence in support of a force majeure defense with respect to the allegations because (i) force majeure supposedly cannot be used as a defense against failure to comply with statutory requirements, namely the requirement to pay the Annual License Fees and Casino Regulatory Fees, and (ii) force majeure supposedly cannot be used as a defense to failure to comply with Commission Orders, namely the alleged failure to comply with Commission Order 2020-003.

**The Potential Capital Infusion**

52. IPI has endeavored to secure additional financing in order to allow it to make payments due to the CCC and to other creditors and to resume its operations. Those efforts have been slowed and complicated by continuing and stringent restrictions put in place across China for

the purpose of halting the spread of the COVID-19 virus, which have had the effect of completely restricting or dramatically limiting the ability to travel to and from China.

53. On May 14, 2022, IPI's effort to obtain additional financing have culminated in the execution of Memorandum of Understanding with IH Group through which a total of $150 million will be infused into IPI for the purposes of satisfying IPI's creditors, including the CCC, and completing the casino project. The Memorandum of Understanding provides that the financing tranche will be deposited with IPI before the end of May 2022, and the second tranche will be deposited during June 2022. IPI will use these funds to satisfy IPI's creditors, resume operations, and restart construction.

**The Potential Loss of Financing of IH Group**

54. The revocation of IPI's license following the CCC's hearing scheduled for 24-25 May 2022 puts at risk this much needed capital infusion.

55. Any revocation of IPI's license will likely be viewed as a negative event and may prompt IH Group to decline to make its $150,000,000 investment.

56. In turn, by proceeding with the hearing and attempting to prevent IPI from putting on evidence to support its force majeure defenses, the CCC is creating a risk that IPI will lose this much needed financing and will never be in a position to complete its anticipated investment of more than $1 billion to complete the uncompleted development projects.

57. If that were to happen, IPI will no longer be in a position to create jobs on Saipan, which the CLA expressly contemplated as one of its purposes. The CNMI will lose potential tax revenues and other regulatory and statutory fees. Moreover, there are several partially completed construction sites. If IPI is unable to complete these construction projects, these sites will fall into disrepair and could decline into a blight on one of Saipain's most attractive regions.

**Parties, Jurisdiction and Venue**

58. Plaintiff Best Sunshine is a corporation organized under the laws of the British Version Islands, with its principal place of business at P.O. Box 957, Offshore Incorporation Centre, Road Town, Tortola, British Virgin Islands.

59. Plaintiff IPI is a limited liability company organized under the laws of the Commonwealth of the Northern Mariana Islands ("CNMI"), with its principal place of business at PMB 895 Box 10001, Saipan, 96950, Norther Mariana Islands. Its sole member is Plaintiff Best Sunshine.

60. Defendant is the Commonwealth Casino Commission, an autonomous public agency of the government of the CNMI established pursuant to P.L. 18-56, codified at 4 CMC § 2313(a). Its address is Unit 13 & 14F, Springs Plaza, Gualo Rai, Saipan, 96950, Northern Mariana Islands.

61. This Court has jurisdiction over this dispute pursuant to 9 U.S.C. § 203. That section provides district courts of the United States with original jurisdiction over proceedings falling under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, regardless of the amount in controversy. This is such a proceeding, under 9 U.S.C. § 202, because IPI is a foreign party to an agreement to arbitrate, and the agreement arises out of a legal relationship between the Parties that has a reasonable relationship with one or more foreign states, in particular the home jurisdictions of Best Sunshine where it is sourcing the investments that allows for the performance of the obligations under the CLA.

62. This Court also has diversity jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a)(2) because Plaintiffs are citizens of a foreign state (the British Virgin Islands and Peoples Republic of China) and Defendant is a citizen of CNMI.

63. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) and 9 U.S.C. § 204, because the Defendant resides in this District and a substantial part of the events giving rise to the claims occurred in this District.

## COUNT I

### (PRELIMINARY INJUNCTION IN AID OF ARBITRATION)

64. Plaintiffs hereby repeat and re-allege each and every allegation in paragraphs 1 through 62 as though set forth in full herein.

65. A dispute has arisen between the parties concerning the applicability of *force majeure* under § 25 of the CLA to Plaintiffs' alleged breaches of the CLA. The CLA mandates that this

dispute be resolved through arbitration. IPI therefore initiated arbitration proceedings with the American Arbitration Association (the "AAA") on May 19, 2022. The AAA assigned the matter Case Number 1-22-0002-1598.

66. The AAA notified the Parties on May 20, 2022 that it will not serve as the administering institution under "non-binding rules." In that letter, the AAA invited the Parties to agree to arbitrate their dispute under the AAA's "binding International Dispute Resolution Procedures." The AAA gave the parties until June 3, 2022 to agree. Exh. 3 (AAA Letter). IPI and Best Sunshine are prepared to agree to binding arbitration with the CCC of their disputes.

67. The AAA has further indicated that, although it may not formally serve as the administering institution under non-binding rules, the AAA nevertheless will offer its administrative services to parties to an "ad hoc" arbitration on an "a la carte" basis.

68. Specifically, the AAA offers on its website to make available its "high value case management services" on an "a la carte" basis for "ad hoc or self-administered arbitration" that "make[s] it possible for parties in such cases to utilize various stand-alone administrative services offered by the AAA. These services provide the AAA's high standards, but allow parties to choose only the processes suited to their specific circumstances." Exh. 4 (AAA Website).

69. Even if the CCC will not agree to arbitration under the AAA under its binding International Dispute Resolution Procedures, then IPI, Best Sunshine, and the CCC will still be able to avail themselves of the AAA's administrative services on an "a la carte" basis in the ad hoc arbitration pursuant to Section 30 of the CLA.

70. The CCC Executive Director has begun several Enforcement Actions before the CCC (consolidated as Enforcement Actions 2021-001-005 (consolidated)) and is seeking to revoke IPI's casino license. The Executive Director has filed motions *in limine* seeking orders excluding any evidence of a defense of force majeure in connection with the claims against IPI. The Enforcement Hearing on the CCC's claims is scheduled for May 24-25, 2022. There is a substantial risk that IPI will not be able to present its *force majeure* defense and will lose its license, as a result of which it will lose its potential capital infusion and its solvency will be seriously jeopardized. On the other

hand, CCC will suffer no injury from resolving its dispute with Plaintiffs regarding the applicability of the *force majeure* provision in the agreed-upon forum.

71. The public interest favors an injunction in aid of arbitration in this case. There is a strong federal policy in favor of arbitration and the parties agreed to non-binding arbitration as a part of their mandatory dispute resolution procedures in Section 30 of the CLA. Moreover, enjoining the current proceeding to refer the Parties dispute to arbitration will prevent a course of events that could make it so that IPI will no longer be in a position to create jobs on Saipan, as the CLA expressly contemplated. The CNMI will lose potential tax revenues and other regulatory and statutory fees. Moreover, there are several partially completed construction projects. If IPI is unable to complete these construction works, the sites will fall into disrepair and could decline into a blight on one of Saipain's most attractive regions.

72. If such irreparable and immeasurable injury to Plaintiffs were to occur, the arbitration process would be reduced to a hollow formality, because no arbitral award could return Plaintiffs (or the CNMI for that matter) to the *status quo ante*.

73. By reason of the foregoing, CCC should be immediately restrained from proceeding with Enforcement Actions 2021-001-005 (consolidated), including convening the Enforcement Hearing scheduled for May 24-25, 2022, pending resolution of the *force majeure* question by an ad hoc arbitral tribunal to be appointed by this court pursuant to 9 U.S.C. § 206.

74. Plaintiffs have no adequate remedy at law.

## COUNT II
### (ORDER COMPELLING ARBITRATION)

75. Plaintiffs hereby repeat and re-allege each and every allegation in paragraphs 1 through 74 as though set forth in full herein.

76. A dispute has arisen between the parties concerning the applicability of *force majeure* under § 25 of the CLA to Plaintiffs' alleged breaches of the CLA.

77. Section 30 of the CLA provides:

> A dispute ("Dispute") is defined as any and all disagreement(s) between the Parties as to terms or requirements of this License Agreement excluding

issues relating to gaming operations which are under the authority of the Casino Commission and proceedings regarding revocation or suspension of this license. The Parties acknowledge that due to the nature and complexity of this License Agreement, disputes may arise concerning requirements. In order to provide a structure for resolution of disputes the Parties agree to the following dispute resolution process that must be used prior to the initiation of court proceedings:

a. Parties must maintain good faith and fair dealing in License Agreement interpretation and attempt to resolve issues of conflicting interpretation through informal communications whenever possible.

b. Upon identification of issue of dispute, the Party claiming a dispute ("Initiating Party") must identify legal basis in a brief writing and provide this to other party ("Responding Party") for consideration ("Presentation of Dispute").

c. Parties must agree to meet and confer ("Meet-and-Confer") within ten working days of Presentation of Dispute in an attempt to clarify and resolve issue.

d. If Parties fail to resolve dispute after meeting and conference, then the Responding Party must provide brief written response to Initiating Party identify its basis for rejection of Dispute ("Response to Dispute").

e. Within ten working days of provision of Response to Dispute, Parties must again Meet-and-Confer and attempt to resolve Dispute.

f. If Parties fail to resolve dispute, Parties may submit the dispute to the American Arbitration Association for non-binding arbitration in accordance with applicable rules and limited by terms of this License.

g. Parties shall equally share all costs associated with Arbitration.

h. Decisions of the Arbitrator are not binding and within 30 days of issuance of decision of the arbitrator a Party may submit the issue to the Commonwealth Superior Court.

i. This process shall not be applicable to License suspension and revocation proceedings as shown in section 31 below.

The Commonwealth Casino Commission may establish separate dispute resolution procedures for issues relating to gaming operations which shall supersede this process.

78. Any arbitration under Section 30 is an international arbitration falling under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards under the provisions of 9 U.S.C. § 202.

79. By reason of the foregoing, the Court should direct, pursuant to 9 U.S.C. § 206, that arbitration be held in this District, in accordance with the terms of the parties' agreement.

80. Plaintiffs have no adequate remedy at law.

## COUNT III

## (ORDER APPOINTING ARBITRATOR

## PURSUANT TO 9 U.S.C. § 206)

81. Plaintiffs hereby repeat and re-allege each and every allegation in paragraphs 1 through 74 as though set forth in full herein.

82. The AAA has indicated that it "does not administer cases under non-binding rules" but rather that it offers its administrative services to parties to *ad hoc* (or non-administered) arbitrations on an "a la carte" basis. As a result, the AAA will not proceed to administratively appoint the Parties' arbitrator unless the CCC agrees to arbitration with IPI and Best Sunshine under the AAA's "binding International Dispute Resolution Procedures."

83. Accordingly, implementation of the arbitration agreement in Section 30 of the CLA requires this Court to exercise its powers under 9 U.S.C. § 206 to appoint an arbitrator to preside over the arbitral proceedings. The Parties will then have the opportunity, in consultation with the arbitrator, to choose which, if any, of the AAA's administrative services to utilize in their *ad hoc* arbitration.

84. Plaintiffs have no adequate remedy at law.

WHEREFORE, Plaintiffs pray for the following relief:

A. That the Court enter immediately a temporary restraining order enjoining Defendant Commonwealth Casino Commission, its Executive Director, employees, agents and attorneys, and all persons acting in concert with it or them, from proceeding with Enforcement Actions 2021-001-005 (consolidated), including convening the Enforcement Hearing scheduled for May 24-25, 2022.

B. That the Court preliminarily enjoin Defendant Commonwealth Casino Commission, its Executive Director, employees, agents and attorneys, and all persons acting in concert with it or them, from proceeding with Enforcement Actions 2021-001-005 (consolidated), pending the award of the arbitrators in the arbitration.

C. That the Court direct Defendant Commonwealth Casino Commission to proceed with this arbitration, and that if the AAA is unwilling to administer the arbitration under non-binding rules, that the Court order the non-binding arbitration to proceed on an *ad hoc* basis, and its power under 9 U.S.C. § 206 to appoint a sole arbitrator who shall fix the rules of procedure and preside over the arbitration.

D. That the Court grant such other, further, and different relief as it may deem just and proper.

DATED: May 23, 2022

JOEY P. SAN NICOLAS
SAN NICOLAS LAW OFFICE, LLC

KEVIN T. ABIKOFF
SAMUEL W. SALYER
HUGHES HUBBARD & REED LLP

_____
Joey P. San Nicolas
Attorneys for Plaintiffs
BEST SUNSHINE INTERNATIONAL LTD. (BVI)
AND IMPERIAL PACIFIC INTERNATIONAL
(CNMI), LLC